Filed 9/10/25 (unmodified opn. attached)

**CERTIFIED FOR PARTIAL PUBLICATION***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JOSE ANGEL MENDEZ-TORRES,<br><br>    Defendant and Appellant. | A168697<br><br>(Sonoma County<br>Super. Ct. No. SCR7562641)<br><br>**ORDER MODIFYING OPINION AND DENYING REHEARING**<br>**[NO CHANGE IN JUDGMENT]** |

**BY THE COURT:**

Appellant's petition for rehearing is denied.

The opinion filed on August 27, 2025, is modified as follows:

In the last paragraph on page 34, replace the following two sentences:

Mendez-Torres asserts that the DUI evidence was "conflicting and hotly contested" but cites nothing to support this assertion. Indeed, the evidence that he drove under the influence was both considerable and uncontroverted.

with:

---

\* Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of Discussion sections A.3.ii, A.3.iv, A.3.v, C., D., and E.

1

Mendez-Torres asserts that the DUI evidence was "conflicting and hotly contested" but the evidence that he drove under the influence was considerable.

This order does not effect a change in the judgment.

CHOU, J.

We concur:

SIMONS, ACTING P. J.
BURNS, J.

*People v. Mendez-Torres* (A168697)

2

## A168697/The People v. Jose Angel Mendez-Torres

Trial Court:      Superior Court of the County of Sonoma, No. SCR7562641.

Trial Judge:      Hon. Mark A. Urioste.

Counsel:      Kelly C. Martin, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Jeffrey M. Laurence, Senior Assistant Attorney General, Bridget Billeter, Supervising Deputy Attorney General, Moona Nandi and Brady A. Baldwin, Deputy Attorneys General, for Plaintiff and Respondent.

Filed 8/27/25 (unmodified opinion)

**CERTIFIED FOR PARTIAL PUBLICATION***

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>v.<br><br>JOSE ANGEL MENDEZ-TORRES,<br><br>     Defendant and Appellant. | A168697<br><br>(Sonoma County<br>Super. Ct. No. SCR7562641) |

Defendant Jose Angel Mendez-Torres appeals a final judgment following his convictions for, among other things, robbery, fleeing a peace officer and causing serious bodily injury, and driving under the influence of a drug and causing injury. The jury also found true various aggravating factors. On appeal, Mendez-Torres argues that his robbery conviction should be reversed because there was insufficient evidence that he used force or fear to accomplish the crime. He also argues that there was insufficient evidence of several aggravating factors, including that he caused great monetary damage to a truck or that the driver of the truck was a particularly vulnerable victim. Mendez-Torres further argues that evidence of his prior criminality was improperly admitted and that the prosecutor committed prejudicial misconduct during closing arguments. Finally, in response to our

---

\* Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of Discussion sections A.3.ii, A.3.iv, A.3.v, C., D., and E.

1

request for supplemental briefing, Mendez-Torres argues that his robbery conviction should be reversed for instructional error. We agree with this last argument and therefore reverse that conviction. We also reverse the aggravating factor of great monetary damage to the victim's truck and remand for limited resentencing due to this reversal. We affirm in all other respects.

In the published portions of the opinion, we hold that there is sufficient evidence to support the robbery conviction because the surveillance videos and testimony establish that the victim engaged in physical resistance by placing her hand on the cash register as Mendez-Torres was violently wresting it away. This physical resistance necessarily required additional force, however minimal, to overcome it. Nonetheless, we reverse the robbery conviction because the definition of force used in the modified robbery instruction given by the trial court focused *solely* on the actions of Mendez-Torres. Because the jury was not told to consider the victim's physical resistance even though Mendez-Torres never touched the victim herself, the instruction was erroneous and prejudicial. We also hold that there is sufficient evidence to support the vulnerable victim aggravating factor because Mendez-Torres struck the vehicle of the victim who was parked on the side of the road and in the process of exiting his vehicle.

## BACKGROUND

### A. Procedural History

A consolidated information charged Mendez-Torres with: (1) second degree robbery (Pen. Code,[1] § 211; count one); (2) grand theft of personal property (*id.*, § 487, subd. (a); count two); (3) second degree commercial

---

[1] All further statutory references are to the Penal Code unless otherwise specified.

2

burglary (*id.*, § 459; count three); (4) driving under the influence (DUI) of a drug and causing bodily injury (Veh. Code, § 23153, subd. (f); count four); (5) fleeing a peace officer and causing serious bodily injury (*id.*, § 2800.3, subd. (a); count five); (6) fleeing a peace officer and driving against traffic (*id.*, § 2800.4; count six); (7) fleeing a peace officer while driving recklessly (*id.*, § 2800.2, subd. (a); count seven); (8) leaving the scene of an accident (*id.*, § 20001, subd. (a); count eight); (9) giving false information to a police officer (Pen. Code, § 148.9, subd. (a); count nine); (10) possession of methamphetamine (Health & Saf. Code, § 11377, subd. (a); count 10); (11) possession of a methamphetamine pipe (*id.*, § 11364, subd. (a); count 11); (12) unlawful tear gas activity (Pen. Code, § 22900; count 12); and (13) taking a vehicle without consent (Veh. Code, § 10851, subd. (a); count 13).

As to count four, the information alleged that Mendez-Torres personally inflicted great bodily injury (GBI) (§ 12022.7, subd. (a)). The information also alleged he had suffered one prior strike offense (§§ 667, subds. (d) & (e), 1170.12, subds. (b) & (c)) as well as a prior serious or violent felony (§ 667, subd. (a)). It also alleged several aggravating factors.

On the prosecution's motion, the trial court dismissed counts two and 13. Mendez-Torres pled no contest to count 12. Following trial, the jury found Mendez-Torres guilty on all remaining counts and found true the aggravating factors, including, with respect to counts four and five, that the victim was particularly vulnerable and that the crime involved property damage of great monetary value.

The trial court sentenced Mendez-Torres to an aggregate term of 24 years 8 months in prison on the felony convictions. It designated count five (fleeing a peace officer and causing serious bodily injury) as the principal term and imposed an aggravated term of seven years, doubled to 14 years for

the prior strike conviction.  On count one (robbery), the court imposed a consecutive term of one year, doubled to two years for the prior strike.  The court imposed consecutive terms of two years four months on count four (DUI causing injury) and 16 months on count eight (leaving the scene).  It further imposed a consecutive five-year term for the prior serious felony enhancement.  The court stayed the imposition of Mendez-Torres's other terms pursuant to section 654.  Finally, on each of the misdemeanor convictions (counts 9, 10, 11, and 12), the court imposed a concurrent term of six months in jail.  Mendez-Torres timely appealed.

**B.  Facts**

1.  *The Robbery*

On August 15, 2022, J.S. was working as a cashier at a gas station convenience store.  Around 5:40 p.m., a surveillance video showed Mendez-Torres park in front of the store and walk inside.  He was wearing sunglasses, a black and red baseball cap, and tan pants.  J.S. was sitting behind the counter a few feet away from the cash register, looking at her phone.  The register was not fixed to the counter and had a computer and other items sitting on top of it.  Mendez-Torres approached the counter, grabbed the register, and began pulling it off the counter.  He knocked over various items, including the computer and a receipt printer attached to the register.  J.S. jumped up and tried to grab the register and pull it toward her but was only able to place her left hand on top of the register briefly as Mendez-Torres yanked it away.  She did, however, get her "hand[] on the register."  From the surveillance videos, it appeared that Mendez-Torres briefly paused when J.S. touched the register with her full hand but then yanked out the inner cash drawer, causing the outer box of the register and other items on top of the register to fall on the floor.  He then ran out the

4

door with the inner cash drawer.  The drawer contained $2,250.

As Mendez-Torres got into his car and drove off, J.S. followed him outside to get his license plate number.  She testified that she was scared during these events because "[h]e could have had a knife, he could have had a gun, he could have harmed me."  J.S. further testified that she was physically intimidated because Mendez-Torres was bigger than her and had stared at her with "an angry expression on his face" when he grabbed the register.  However, she confirmed that Mendez-Torres did not have a weapon and did not say anything to her.  Later that evening, the cash drawer was found wrapped in a sweatshirt near a park.  It contained some coins and papers that included the gas station's address.

The next morning, the police found an unoccupied silver Buick in a parking lot near the park that matched the description of the car associated with the robbery.  Inside, the police found a baseball cap and a pair of tan pants similar to those Mendez-Torres wore at the gas station.  They also found paperwork with Mendez-Torres's name, including a citation from the Gilroy Police Department, a prisoner property receipt, and an envelope addressed to Mendez-Torres at the Monterey County jail.

## 2. *Driving Under the Influence and Fleeing*

At 12:53 p.m. on the day after the robbery, Mendez-Torres was driving a black Honda when Officer Guadalupe Figueroa pulled him over for making a turn without signaling. When Figueroa asked for his driver's license, Mendez-Torres responded that he lost his wallet and that his name was Efrain Mendez.  Figueroa saw a clear bottle of marijuana in the back seat of the car and asked Mendez-Torres if he had smoked marijuana.  He responded he had not.  Figueroa noticed that Mendez-Torres's eyes were glossy and that he was "very fidgety."  She tested his eyes for "lack of smooth pursuit" and

asked how much he drank that day. He responded that he had one margarita about two hours ago. After receiving Mendez-Torres's information and photo from dispatch, Figueroa asked if his name was "Jose," which he denied. She responded that he was not being honest, showed him the photo she received from dispatch, and asked if it was him. Mendez-Torres became nervous and began clenching the steering wheel. When Figueroa asked him to take off his hat, he drove off.

Officer Figueroa got into her patrol car, activated her lights and sirens, and pursued Mendez-Torres. During the pursuit, Mendez-Torres ran a stop sign and drove approximately 25 miles per hour over the speed limit. He eventually crashed into the front of a truck that was parked on the opposite side of the road. The driver of the truck, D.G., had pulled over after hearing the sirens and seeing people scrambling around him. He had removed his keys from the ignition and was about to get out of the truck when Mendez-Torres struck him. D.G. was dazed for a few seconds but eventually climbed out of the passenger side window after bystanders could not open the driver or passenger side doors.

Following the collision, Mendez-Torres's car spun out of control and came to a stop near a creek. Mendez-Torres jumped out and ran down the creek. Another officer arrived at the scene and detained him. Mendez-Torres had $1,965.55 in his pockets. When Figueroa placed him in the back of her patrol car, he appeared sluggish and made a spontaneous statement that he had taken crystal, a street term for methamphetamine. The police found a methamphetamine pipe underneath the seat of Mendez-Torres's car and a small bag of methamphetamine on the street near the car. Mendez-Torres's blood was subsequently drawn pursuant to a warrant and revealed

methamphetamine at a concentration of 185 nanograms per milliliter.[2]  A drug recognition expert evaluated him 30 to 40 minutes after his arrest and concluded that he was under the influence and could not safely operate a motor vehicle.

## DISCUSSION

### A.  Sufficiency of the Evidence

Mendez-Torres contends that there was insufficient evidence to support his robbery conviction and four aggravating factors found to be true by the jury.  We disagree as to the robbery conviction and three of those aggravating factors.  We, however, agree that the evidence was insufficient to support one of the aggravating factors—that the cost to repair the damage to D.G.'s truck caused by Mendez-Torres was great.  We therefore remand for resentencing as to the two counts—DUI causing injury and fleeing a peace officer and causing serious bodily injury—impacted by that factor.

### 1.  *Standard of Review*

When a defendant challenges his conviction or aggravating factor based on insufficiency of the evidence, "the court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Johnson* (1980) 26 Cal.3d 557, 578.)  We " ' "presume in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence." ' " (*People v. Davis* (1995) 10 Cal.4th 463, 509.)

---

[2]  For comparison, methamphetamine is prescribed for therapeutic purposes in the range of 20 to 55 nanograms per milliliter.

## 2. *Robbery*

Mendez-Torres argues that his conviction for robbery should be reversed because there was insufficient evidence that he used force or fear to take the cash register. We disagree because we find sufficient evidence that the robbery was accomplished by force.[3]

### i. Law on Robbery by Force

"Robbery is the felonious taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear." (§ 211.) " 'The terms "force" and "fear" as used in the definition of the crime of robbery have no technical meaning peculiar to the law and must be presumed to be within the understanding of jurors.' " (*People v. Mungia* (1991) 234 Cal.App.3d 1703, 1708.) But to elevate a theft to a robbery, "something more is required than just that quantum of force which is necessary to accomplish the mere seizing of the property." (*People v. Morales* (1975) 49 Cal.App.3d 134, 139.) This "is a question of fact to be resolved by the jury taking into account the physical characteristics of the robber and the victim." (*People v. Wright* (1996) 52 Cal.App.4th 203, 210 (*Wright*).)

In *People v. Burns* (2009) 172 Cal.App.4th 1251, 1259 (*Burns*), the Court of Appeal clarified that " ' "[a]ll the force that is required to make the offense a robbery is such force as is actually sufficient to overcome the victim's resistance." ' " "[T]he force need not be great . . . ." (*People v. Lopez* (2017) 8 Cal.App.5th 1230, 1235 (*Lopez*).) Indeed, "the fact of the victim's resistance," and not "the amount of force applied" by the perpetrator, is the key issue. (*Ibid.*; cf. *People v. Collins* (2021) 65 Cal.App.5th 333, 341

---

[3] The People do not argue that there is sufficient evidence that the robbery was accomplished by fear.

(*Collins*) [in determining whether there is fear sufficient to establish a robbery, "what matters is whether the victim . . . was *subjectively* in fear, not whether a hypothetical and objective 'reasonable person' standing in the victim's shoes would have been afraid"].)  Thus, "a victim's physical resistance will convert a theft into a robbery, *regardless of the amount of force involved.*"  (*Lopez*, at pp. 1230, 1236-1237, italics added.)  Consistent with these principles, this Division in *People v. Hudson* (2017) 11 Cal.App.5th 831, 839 (*Hudson*) held that "*any* force sufficient to overcome a victim's resistance will necessarily be more force than required to seize the property.  That is, if a victim resists during the initial seizure, the force applied is necessarily more than required to seize the property absent resistance; and, if a victim does not resist at the time of seizure, force applied to overcome subsequent resistance is force in excess of that required to effect the initial seizure."  (Italics added.)

ii.   Analysis

Mendez-Torres contends that there was insufficient evidence of force to elevate his theft to a robbery because he "used only the force needed to pull the heavy [cash] register off the counter" and "nothing [J.S.] did required him to apply more force than was necessary to do that."  We disagree.

It is uncontroverted, based on the surveillance videos and J.S.'s trial testimony, that Mendez-Torres walked into the store, immediately grabbed the register, and started pulling it off the counter.  The register was heavy, and he used enough force to knock over the computer sitting on top of the register as well as other items on the counter.  J.S., who was on her phone, jumped up when she saw Mendez-Torres grab the register and reached for the register.  She testified that she tried to "pull" the register to her "side" of the counter and away from Mendez-Torres and was able to get her "hand[]

9

on the register." The surveillance videos show that she was able to place her left hand near the center of the register. When she did this, Mendez-Torres appeared to pause briefly before violently pulling the inner cash drawer out. J.S. testified that she could not "pull" the register back to her side of the counter because Mendez-Torres "was much stronger."

Because J.S. was able to place her left hand squarely on the register in her effort to pull the cash register back to her side of the counter, there was substantial evidence that she "physically resist[ed]" the seizure of the register. (*Lopez, supra*, 8 Cal.App.5th at pp. 1236-1237.) Under *Lopez*, this is sufficient to support the robbery conviction, "regardless of the amount of force involved." (*Id.* at p. 1237.) Indeed, the physical resistance by J.S. appears to be no less substantial than the physical resistance by the 65-year old victim in *Lopez*—who held on to the door handle of her car as the defendant was driving away with it. (*Id.* at p. 1233.)

In any event, there is good reason why the nature or degree of a victim's physical resistance, including whether the victim applied enough resisting force, should have no bearing on whether a theft may be treated as a robbery. In determining whether a robbery has occurred, "the physical characteristics of . . . the victim" must be taken "into account." (*Wright, supra*, 52 Cal.App.4th at p. 210.) This is because a defendant should not be rewarded for choosing a more vulnerable victim who is unable to provide much physical resistance. For example, a defendant should not be able to avoid a robbery conviction by choosing elderly or disabled victims who have physical limitations that prevent them from grabbing or pulling items— particularly heavier items like a cash register. That an elderly or disabled victim may do no more than place his or her hand on an item when physically resisting the taking of that item from his or her person does not

10

alter the fact that the defendant used force to overcome that resistance. Thus, whether a theft constitutes a robbery should not depend on the nature or degree of the victim's physical resistance. Otherwise, a defendant would be rewarded for choosing a more vulnerable victim.

The video evidence of the admittedly brief struggle between J.S. and Mendez-Torres is sufficient to support a finding that Mendez-Torres used force to overcome J.S.'s physical resistance—which, in turn, is enough force to establish a robbery. (See *Hudson, supra,* 11 Cal.App.5th at p. 839 ["any force sufficient to overcome a victim's resistance will necessarily be more force than required to seize the property"].) This conclusion is bolstered by J.S.'s testimony that she tried to "pull" the register away from Mendez-Torres, that she was able to get her "hand[] on the register," and that she was unable to pull the register back to her side of the counter because Mendez-Torres was much bigger and stronger than her. (*Wright, supra,* 52 Cal.App.4th at p. 210 [jury may take into account the physical characteristics of the robber and the victim in determining whether force was used to commit the robbery].)

While it is certainly difficult to determine whether J.S.'s physical resistance necessitated any additional force to overcome it from the surveillance videos alone, it is impossible to conclude that it did not. Because the register—which appeared to be quite heavy—was sitting on or near the surface of the counter when J.S. placed her hand on top of it, it is impossible to determine the amount of force, if any, she was exerting on the register. But because Mendez-Torres grabbed the register in a sudden and violent manner and because he was noticeably bigger than J.S., it is just as reasonable to infer from the videos that J.S. exerted physical resistance that would require some additional, albeit minimal, force to overcome. This

11

reasonable inference is squarely supported by the videos and is not based on speculation.  And to the extent that doubt remains, J.S.'s testimony that she tried to "pull" the register to her "side," that she got her "hand[] on the register," and that she was unable to pull the register away from Mendez-Torres because he was much bigger and stronger bolsters the inference that she exerted *some* physical force, however weak, in resistance to the far greater physical force exerted by the far bigger and stronger Mendez-Torres in taking the register.[4]

Admittedly, the facts in this case are different than the facts in the robbery cases that the parties cited because Mendez-Torres did not touch J.S.—who briefly touched the register with her left hand as he yanked it away—or because the victims in those cases were able to demonstrate greater physical resistance than J.S. did.  For example, in *People v. Garcia* (1996) 45 Cal.App.4th 1242, 1246, the defendant "approached the cashier while the register drawer was open and gave her a slight push, 'like a tap,' on her shoulder with his shoulder.  Fearful [he] might be armed, the cashier moved away."  The Court of Appeal concluded that this "rather polite . . . use of force" was still sufficient to support a robbery conviction, as "the degree of force is immaterial." (*Ibid*.)  In *People v. Harris* (1977) 65 Cal.App.3d 978, 989, the Court of Appeal likewise found sufficient evidence of force where a jewelry store employee, upon seeing the defendant pry open a display case with a butcher knife, put her hands on top of the glass in an attempt to stop him.  The defendant, however, "exerted more pressure than she did and reached in and got three cases of diamonds." (*Id*. at p. 981.)  Finally, in

---

[4] But if J.S. had not been able to touch the cash register, then there would have been insufficient evidence of force because there would have been no reasonable inference that she exerted any physical resistance that Mendez-Torres had to overcome.

*Burns, supra,* 172 Cal.App.4th at page 1259, the Court of Appeal found sufficient evidence of force because the victim "tried to hold onto [her] purse but [the defendant's] strength and his act in stepping on her foot overcame her resistance."

As these cases illustrate, "[f]or thefts of most personal property, there is an appreciable distinction between the quantum of force necessary to seize the property from an unresisting victim, and the additional force needed to seize the property if the victim fights back." (*Lopez, supra,* 8 Cal.App.5th at p. 1236.) That distinction is less clear where, as here, the force needed to grab a cash register is considerably greater than the force needed to snatch a lighter object like a purse. As a result, a defendant stealing a cash register like the one in this case need not exert as much *additional* force to overcome a victim's physical resistance. This appeared to be true here as Mendez-Torres violently wrested the cash register from the counter as J.S. placed her hand on the register, causing objects on the counter and register, including a computer, to go flying. But under the relevant case law, the use of *any* force that overcomes *any* physical resistance by the victim is sufficient to establish a robbery. (See, e.g., *Hudson, supra,* 11 Cal.App.5th at p. 839.)

Finally, focusing on the victim's physical resistance when the defendant does not physically touch the victim, rather than the force exerted by that defendant, makes sense from a policy perspective. (*Lopez, supra,* 8 Cal.App.5th at pp. 1236-1237; see also *Collins, supra,* 65 Cal.App.5th at p. 341 [focusing on the victim's subjective fear, rather than the defendant's actions].) "It is sensible to treat a theft more severely under the law when it involves overcoming a victim's resistance, because the risk of harm to the victim is greater, and the crime is commensurately more serious." (*Lopez,* at p. 1237.) And whenever a victim is able to physically contact an object in an

effort to stop the theft of that object, that victim is unequivocally close enough to the defendant to create a greater risk of harm. Indeed, J.S.'s physical resistance arguably created a greater potential for harm as the outer box of the cash register or the objects on top of the register could have fallen away from Mendez-Torres and onto J.S.'s hand as Mendez-Torres violently yanked the inner cash drawer out. Because the evidence is sufficient to establish that J.S. physically resisted by reaching out and placing her left hand near the center of the register, however briefly, in trying to stop the theft, a jury could find that Mendez-Torres, by successfully taking the register notwithstanding this physical resistance, used force to commit a robbery. Based on the evidence at trial, including the surveillance videos, we will not disturb the jury's finding of force as it was within its purview to determine this question of fact. (*Wright, supra,* 52 Cal.App.4th at p. 210.)

### 3. *Aggravating Factors*

Mendez-Torres argues that the evidence was insufficient to support the following aggravating factors found to be true by the jury: (1) the monetary value of the cost to repair D.G.'s truck was great; (2) D.G. was a particularly vulnerable victim; (3) the robbery involved planning, sophistication, or professionalism; and (4) the robbery involved a taking of great monetary value. We agree that the evidence was insufficient to support a finding of great monetary damage to D.G.'s truck and that a limited remand for resentencing is therefore warranted. We, however, find sufficient evidence to support the other aggravating factors.

### i. Standard

Section 1170, subdivision (b)(2) "requires that, excepting prior convictions and in the absence of a waiver or stipulation, aggravating facts

relied upon to justify an upper term must be resolved by the jury beyond a reasonable doubt." (*People v. Lynch* (2024) 16 Cal.5th 730, 755 (*Lynch*).) A Sixth Amendment violation occurs "when the trial court relies on unproven aggravating facts to impose an upper term sentence, even if some other aggravating facts relied on have been properly established. The violation is prejudicial unless an appellate court can conclude beyond a reasonable doubt" that the error was harmless under *Chapman v. California* (1967) 386 U.S. 18 (*Chapman*). (*Lynch,* at p. 768.) If it cannot, "the defendant is entitled to a remand for resentencing."[5] (*Ibid.*) We review an aggravating factor finding for substantial evidence. (*People v. Morgan* (2024) 103 Cal.App.5th 488, 520.)

ii.   Great Monetary Damage to Truck

Mendez-Torres contends that there was insufficient evidence that the damage to D.G.'s truck was great. We agree.

With respect to counts four (DUI causing injury) and five (fleeing a peace officer and causing serious bodily injury), the trial court instructed the jury that it must decide whether the prosecution proved the additional allegation that, "during the commission of the crimes . . . [Mendez-Torres] damaged property belonging to [D.G.]; and . . . the monetary value of the cost to repair the damaged property was great." The court instructed the jurors that although they did "not [all] need to agree on a specific monetary value," they must agree that "[Mendez-Torres's] conduct was distinctively worse than the ordinary commission of the underlying crime."

D.G.'s truck was a 2003 Toyota Tacoma that he had bought brand new.

---

[5] The People concede that "[i]f the trial court relied on any aggravating facts not supported by sufficient evidence, the defendant is entitled to a remand for resentencing, even if other aggravating facts have been properly established."

15

It was approximately 19 years old at the time of the collision. D.G. testified that all of the damage was to the front of his truck and that his rearview mirror was shattered. Photos of the truck taken after the collision depicted a large dent to the front driver's side door. An accident investigator testified that the damage was "pretty nominal" and that it would have been much greater if the truck had been moving.

We agree that substantial evidence did not support the jury's finding that the cost to repair D.G.'s truck was great. D.G. did not testify about the cost of any repairs or the value of his truck and the prosecution did not present evidence of any repair costs or estimates or the value of the truck. Nor was there evidence that the damage to the truck was distinctively worse than the damage that normally occurs during a DUI causing bodily injury or while fleeing a peace officer and causing serious bodily injury. Indeed, an investigator described the damages as "nominal." The People highlight that "[t]he damage to [D.G.]'s driver's and passenger's side doors was so great that people who tried to come to his assistance could not open them." That by itself, however, does not mean that the cost to *repair* the damage was great in the absence of any evidence of that cost, especially given that the truck was almost 20 years old.

Because the trial court improperly relied on this aggravating factor in sentencing Mendez-Torres on counts four and five, we must remand for resentencing on those counts. (See *Lynch, supra*, 16 Cal.5th at p. 768.)

### iii. Particularly Vulnerable Victim

Mendez-Torres contends that there was insufficient evidence to establish that D.G. was particularly vulnerable. We are not persuaded.

The trial court instructed the jury with respect to counts four (DUI causing injury) and five (fleeing a police officer and causing serious bodily

16

injury) that it must decide whether D.G. was a particularly vulnerable victim. The court explained that "[p]articularly vulnerable includes being defenseless, unguarded, unprotected or otherwise susceptible to the defendant's criminal act to a special or unusual degree." The instruction further provided that the jury should consider "the particular circumstances of [D.G.] and the manner and setting in which the crime was committed." However, the jury could not find the allegation to be true unless it agreed that "the People have proved that [Mendez-Torres's] conduct was distinctively worse than an ordinary commission of the underlying crime."

Mendez-Torres contends that D.G. "was no more vulnerable than any other driver on the road" who is confronted with a defendant driving under the influence. He relies on several cases in which the victims were not found to be particularly vulnerable in the vehicular manslaughter context.

For example, in *People v. Bloom* (1983) 142 Cal.App.3d 310 (*Bloom*), the defendant was driving under the influence, swerved into oncoming traffic, and struck the victim's car head-on. (*Id.* at pp. 314-315.) In concluding that the victim was not particularly vulnerable, the Court of Appeal reasoned, "There are few individuals as 'defenseless, unguarded, unprotected, accessible, assailable and susceptible' as those who have the misfortune of being in the wrong place at the wrong time when a drunk driver takes to the road." (*Id.* at p. 322.) It continued that because "[a]ll victims of drunk drivers are 'vulnerable victims,'" the victim here "cannot be considered to be vulnerable 'in a special or unusual degree, to an extent greater than in other cases.'" (*Ibid.*)

In *People v. Piceno* (1987) 195 Cal.App.3d 1353 (*Piceno*), the defendant was driving under the influence, skidded off the road, and fatally crushed a pedestrian, who "had been standing 20 feet from the road," against a

17

concrete wall. (*Id*. at p. 1355.) The Court of Appeal concluded that "regrettably all victims of vehicular manslaughter—be they pedestrians, fellow drivers or passengers—were vulnerable. They unfortunately were in the wrong place at the wrong time." (*Id*. at p. 1358.) The court further commented that "the drunk driver does not seek to take deliberate advantage of the vulnerability of victims, unlike the situation in other criminal cases." (*Ibid*.)

But as Mendez-Torres acknowledges, more recent cases have distinguished *Bloom* and *Piceno*. In *People v. Weaver* (2007) 149 Cal.App.4th 1301 (*Weaver*), for example, the defendant was driving under the influence late at night without her headlights on. (*Id*. at p. 1308.) She drove at a high speed on the wrong side of the highway and collided head-on with another car. The driver of that car suffered serious injuries while the passenger died. (*Ibid*.) In affirming that these victims were particularly vulnerable, the Court of Appeal reasoned that "one can envision many situations involving gross vehicular manslaughter . . . in which the victim has at least some advance notice or warning of the imminent risk posed by the defendant's car, thereby allowing him or her at least some opportunity to attempt to avoid the collision." (*Id*. at p. 1316.) It then held that the victims here "were *particularly* vulnerable because they, apparently unlike 'usual' victims of gross vehicular manslaughter, had absolutely no advance warning or ability to attempt to avoid the oncoming car." (*Ibid*.)

The People initially contend that we need not consider Mendez-Torres's argument because the trial court only imposed the upper term on count five (fleeing from a peace officer and causing serious bodily injury), which does not involve a DUI (count four). We, however, need not address this contention because we find substantial evidence that D.G. was a particularly

18

vulnerable victim as to both counts four and five.

While we agree with *Bloom* that "[a]ll victims of drunk drivers are 'vulnerable victims,' " we also agree that there may be "extraordinary situations in which a drunk driving victim might be considered to be 'particularly vulnerable.' " (*Bloom, supra*, 142 Cal.App.3d at p. 322.) Here, after hearing the police sirens, D.G. pulled over to the side of the road, took his keys out of the ignition, and was about to exit his truck. This distinguishes him from the "usual" victim in a case like *Bloom* where the victim was struck while driving on the road and presumably wearing a seat belt, was aware of the drunk driver, and could have potentially maneuvered to avoid the collision. Indeed, D.G. sat in a parked truck and was in the process of getting out of his truck when Mendez-Torres barreled toward him at a high speed and struck the truck. Thus, he had no realistic opportunity to avoid the collision.

Mendez-Torres counters that D.G. should not be considered a particularly vulnerable victim because he had taken active measures to protect himself. We disagree. D.G. was more vulnerable precisely *because* of the measures he took to protect himself—he had parked on the side of the road after hearing the sirens and was focused on getting out of his truck when Mendez-Torres crossed over the lane and struck him at a high speed. He therefore did not have any advance warning that Mendez-Torres was speeding toward him or the ability to avoid the collision that he may have had if he were still driving and vigilant of the other cars on the road. (*Weaver, supra,* 149 Cal.App.4th at p. 1316.) Although Mendez-Torres may not have taken a "cheap shot" like the defendants in other criminal cases with particularly vulnerable victims, D.G. was still particularly vulnerable because he was more unguarded and defenseless than the typical victim of a

19

DUI at the time of the collision.

####           iv.    Planning, Sophistication, or Professionalism

Mendez-Torres also challenges the sufficiency of the evidence supporting the jury's finding that he carried out some of his crimes with planning, much less sophistication or professionalism. Again, we are unpersuaded.

With respect to counts one (robbery) and three (commercial burglary), the jury was asked to determine whether the offenses were "carried out with planning, sophistication, or professionalism." The trial court explained, "Planning refers to conduct before the crime preparing for its commission. [¶] Sophistication refers to conduct demonstrating knowledge or awareness of the complexities or details involved in committing the crime. [¶] Professionalism refers to conduct demonstrating particular experience or expertise." The jury found this factor to be true and the court imposed the upper term of three years, doubled to six years because of the prior strike, on count three but stayed it pursuant to section 654.

Substantial evidence supports the jury's finding that Mendez-Torres planned the burglary and robbery of the gas station. He parked his car right next to the entrance to the gas station store to enable a quick escape with a heavy cash register. He wore a baseball cap and sunglasses to somewhat disguise his appearance. He briskly walked to the counter while J.S. was looking at her phone and immediately grabbed the register. The jury could reasonably infer that Mendez-Torres knew that the register was not affixed to the counter and contained a sizeable amount of cash—$2,250—at that time. He then ran back to his car with just the inner cash drawer and drove off. Mendez-Torres argues that the crimes were "anything but sophisticated and professional" as he "went into a gas station during broad daylight" and,

20

while being filmed by multiple surveillance cameras, "clumsily ripped the cash register off the counter." Even if this is true, it does not negate that he carried out the robbery and burglary with planning. Mendez-Torres further argues that even if there was some planning involved, there was no evidence that his conduct was " 'distinctively worse' than other ways a store burglary or robbery could be committed." But based on the violent nature in which Mendez-Torres ripped the register off the counter right across from J.S., who jumped out of her seat and tried to grab it back, the jury could reasonably find that his conduct was "distinctively worse" than the conduct in an ordinary commercial burglary or robbery.

v.     <u>Great Monetary Value</u>

Finally, Mendez-Torres challenges the sufficiency of the evidence that the amount of money that he stole from the cash register was great. We reject this challenge as well.

With respect to the robbery and burglary counts, the trial court instructed the jury to decide whether "the monetary value of the cash register and currency inside was great." The jury was not required to "agree on a specific monetary value" but had to find that Mendez-Torres's "conduct was distinctively worse than the ordinary commission of the underlying crime."

Mendez-Torres contends that there was "no evidence that the $2,250 taken from the register was distinctively worse than other ways of committing commercial burglary/robbery." We disagree. $2,250 is a significant amount of cash, and the jury could reasonably find that this sum was of great monetary value. (See *People v. Wright* (1982) 30 Cal.3d 705, 708-709 [losses of $2,300 and $3,250 qualified as great monetary value].) The jury also could have found that this amount of cash was greater than

21

the amount of cash ordinarily found in a gas station cash register, making Mendez-Torres's conduct in taking that cash "distinctively worse."

## B. Instructional Error

After oral argument, we asked for and received supplemental briefing on a number of questions, including whether the modified version of CALCRIM No. 1600 given to the jury misstated the law on the force needed for a robbery. We also asked whether Mendez-Torres forfeited his challenge to any instructional error by failing to object below or raise the issue on appeal. We now find that Mendez-Torres did not forfeit his challenge to the robbery instruction because it misstated an element of robbery and because the misstatement affected Mendez-Torres's substantial rights. (*People v. Franco* (2009) 180 Cal.App.4th 713, 720.) We also find that Mendez-Torres did not forfeit the challenge by failing to raise it in his opening and reply briefs because he arguably raised the issue in objecting to the prosecutor's use of this instruction during closing arguments, because the issue presents "a pure question of law on undisputed facts," and because the parties have fully briefed the issue. (*People v. Yeoman* (2003) 31 Cal.4th 93, 118.) Under these exceptional circumstances, we consider the issue and find that the modified version of CALCRIM No. 1600 given by the court misstated the force element of a robbery. (*Ibid.*) We further find that the instructional error was prejudicial and warrants reversal of Mendez-Torres's robbery conviction.[6]

### 1. *Standard*

We review de novo whether a jury instruction correctly states the law. (*People v. Posey* (2004) 32 Cal.4th 193, 218.) If we find instructional error,

---

[6] We would reach the same conclusion if we considered the challenge to the robbery instruction as an ineffective assistance of counsel claim. (See *Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*).)

22

"the law requires us to affirm a jury verdict . . . if the error was harmless."
(*People v. Hendrix* (2022) 13 Cal.5th 933, 941.)  We " 'evaluate the
harmlessness of violations of the federal Constitution under the standard set
forth in *Chapman* . . . .  This 'stricter' standard of review requires reversal
unless the error is 'harmless beyond a reasonable doubt.' [Citation.]  Among
the constitutional errors subject to *Chapman* review is misinstruction of the
jury on one or more elements of the offense." (*Hendrix* at p. 942.)

> 2. *Relevant Procedural History*

At trial, the prosecutor asked the trial court to add the following
sentence to CALCRIM No. 1600:  "[I]f you find [Mendez-Torres] intended to
steal, you may find he used force to take that property or prevent that
person from resisting . . .[i]f you find he exerted some amount of force in
excess of the amount of force necessary to accomplish the mere seizing of the
property."  Although Mendez-Torres's counsel did not object, the court
responded that it would consider adding the sentence but "may want to
tweak the language."  The court eventually modified CALCRIM No. 1600 by
adding the following definition of force:  "Force as used here means some
amount of force more than the incidental touching necessary to take the
property."

During closing arguments, the prosecutor repeated this instruction and
explained, "if I just went up and picked something up and I didn't harm
anything or get in the way of anything or touch anything other than the
thing I'm taking, that would just be theft.  But if it's any amount of force
more than that, like ripping something or knocking something over,
anything more than just the incidental lifting and carrying away
something . . . ."  Mendez-Torres's counsel objected that the prosecutor
misstated the law.  The court responded, "This is argument.  I'm going to

23

allow him to continue. You can argue your own version of what the instruction on force is." The prosecutor then reiterated, "So as the instruction says, any amount of force more than the incidental touching is force. You can also find fear—candidly, I think in this case force is a little clearer because you can actually see that counter move."

Later, the prosecutor argued based on the surveillance videos that "you see how much the counter shook, you see the force that was used . . . . And there was more force than just the incidental touching. He didn't just politely come up, pick it up and then walk away. He ripped it out of where it was located, he knocked stuff over, he did it with this angry face." Mendez-Torres's counsel countered, "The force for a robbery is someone coming in, they come in, they strike you, they hit you. Say I've got my phone in my hand, someone comes up, they punch me to take my phone or they shoot me and take my phone. That's force for a robbery . . . it's not just general force that it's hard to grab something, it's force to overcome the resistance of the other person. And that's not what happened here."

The prosecutor responded during rebuttal: "The first argument was about force. I didn't object, but the legal standard is not that the defendant . . . hit someone, the defendant struck someone. The standard, as we saw, is that there was some amount of force used and the amount of force is more than the incidental touching necessary to take the property." He then argued, "Is this on the lower end of force? Absolutely. Is this still forceful, the violent yanking, the knocking things over? Absolutely." Mendez-Torres's counsel objected that the prosecutor misstated the law, and the trial court overruled the objection. The prosecutor continued, "if I'm ripping something like a cash register that I can just walk over and pick up carefully, remove without knocking anything over, that's the amount of force

24

necessary to take that property." Mendez-Torres's counsel again objected and the court again overruled the objection.

### 3. *Analysis*

The trial court instructed the jury that the force required for a robbery need only be some amount "more than the incidental touching necessary to take the property." This misstated the law. When the defendant does not physically touch the victim, the victim's *physical resistance* is the key to determining whether there is force sufficient to establish a robbery. As explained above, *any* force applied by the defendant that successfully overcomes this resistance is sufficient to convert a theft into a robbery. (See, *ante*, at pp. 13-14.) The court's instruction, however, defined the force needed for a robbery *solely* in terms of the amount of force exercised by the defendant. In doing so, it made *no* reference to the victim's physical resistance. As a result, the jury could have found that Mendez-Torres accomplished his theft of the cash register by force even if it did not find that J.S. physically resisted. The instruction therefore misstated the element of force required for a robbery where, as here, the defendant did not physically touch the victim.

This instructional error was not harmless beyond a reasonable doubt. First, the prosecutor capitalized on the error during closing arguments. (See *People v. Hayes* (2009) 171 Cal.App.4th 549, 560 ["Closing arguments to the jury are relevant in assessing prejudice from instructional error"].) She argued that Mendez-Torres used force *solely* because he violently ripped the cash register off the counter and knocked things over.[7] More significantly,

---

[7] At oral argument, the People conceded that Mendez-Torres's sudden and violent yanking of the cash register, by itself, did not establish the force needed for a robbery as argued by the prosecutor during closing arguments.

the prosecutor made no mention of any physical resistance by J.S., suggesting, consistent with the erroneous instruction, that physical resistance by the victim was not a relevant factor in finding force. Although Mendez-Torres's counsel countered that the force used in a robbery must be sufficient to overcome the victim's resistance, there is nothing in the record to suggest that the jury considered J.S.'s physical resistance. (Cf. *People v. Brock* (2006) 143 Cal.App.4th 1266, 1282-1283.) To the contrary, the definition of force provided by the trial court—which focused exclusively on the force applied by Mendez-Torres and omitted any reference to J.S.'s resistance—strongly suggests that the jury did not.

The evidence does not render this error harmless. When viewed in the light most favorable to the judgment, that evidence is sufficient to support a finding that J.S. did physically resist by briefly placing one hand on the register as Mendez-Torres grabbed it. But this evidence is not so overwhelming to establish that the jury *would* have concluded beyond a reasonable doubt that J.S. engaged in physical resistance. Indeed, based on the videos and testimony, a juror could have reasonably found that J.S. did not actually resist or contact the cash register in light of: (1) the sudden and violent nature of Mendez-Torres's actions; (2) J.S.'s focus on her phone, rather than Mendez-Torres, when he grabbed the register; (3) the weight of the register—which made it impossible to discern whether J.S. exerted any force on the register—and (4) the brevity of any alleged touching of the register as well as the incident itself. Because we cannot, with any reasonable confidence, conclude otherwise, we reverse the robbery

26

conviction.[8]

## C. **Prosecutorial Misconduct**

Mendez-Torres contends that some of the aggravating factor findings should be reversed because the prosecutor misstated the law during his closing argument.[9]  He also contends that the prosecutor committed prejudicial misconduct by appealing to the passions of the jury.  We disagree.

### 1. *Standard*

"[A] prosecutor commits reversible misconduct if he or she makes use of 'deceptive or reprehensible methods' when attempting to persuade either the trial court or the jury, and it is reasonably probable that without such misconduct, an outcome more favorable to the defendant would have resulted." (*People v. Riggs* (2008) 44 Cal.4th 248, 298 (*Riggs*).)  When a prosecutor is alleged to have misstated the law, we find error only if:  "(1) the prosecutor misstated the law; and (2) there is ' "a reasonable likelihood the jury understood or applied the [prosecutor's remarks] in an improper or erroneous manner." ' " (*Collins*, *supra*, 65 Cal.App.5th at p. 340.)  A prosecutor, however, is allowed to vigorously argue the case and is afforded "significant leeway" in discussing the facts and the law in closing argument. (*People v. Centeno* (2014) 60 Cal.4th 659, 666.)  We do not infer lightly " 'that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements.' " (*Id*. at p. 667.)

---

[8] We would reach the same conclusion under the more lenient *Watson* standard.  (See *People v. Watson* (1956) 46 Cal.2d 818, 837 (*Watson*) [whether it is "reasonably probable that a result more favorable to defendant would have been reached in the absence of the error"].)

[9] Based on our reversal of the robbery conviction, we need not discuss Mendez-Torres's claim of prosecutorial misconduct with respect to robbery.

## 2. *Aggravating Factors*

Mendez-Torres argues that the prosecutor misstated the law as to the particularly vulnerable victim aggravating factor, which prejudiced him.[10] We disagree.[11]

During closing, the prosecutor argued that D.G. "had nowhere to go" and "had no way to get away from the danger" when he was parked on the side of the road, "defenseless" and "unguarded except for the car. Unprotected from this vehicle traveling 60 miles per hour directly at him and susceptible to the criminal act to a special or unusual degree." He then continued, "A 60 miles an hour vehicle driving straight at you makes people *feel vulnerable* when they're trapped in a car and you can't get away." (Italics added.) Defense counsel did not object. Mendez-Torres now contends that it was improper for the prosecutor to ask the jury to consider "whether a victim would *feel* vulnerable in [D.G.]'s circumstance."

We agree with the People that Mendez-Torres forfeited this claim by failing to object at trial. (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1328 (*Seumanu*).) But even if we reach the merits, we would find no prejudice. First, this comment "was an isolated one and . . . was not repeated." (*People v. Pensinger* (1991) 52 Cal.3d 1210, 1250 (*Pensinger*).) Second, it was made in the context of the prosecutor's argument that D.G. was unguarded, unprotected, and defenseless because he was in a parked car and could not get away. These were proper factors to show that a victim was particularly vulnerable. Finally, even if the isolated comment that a victim would *feel*

---

[10] Because we find insufficient evidence to support the aggravating factor of great monetary damage to D.G.'s truck, we need not discuss Mendez-Torres's claim of prosecutorial misconduct with respect to that factor.

[11] We again reject Mendez-Torres's argument that any error deprived him of due process or infected the trial with unfairness.

vulnerable in this context was improper, there is no reasonable likelihood that the jury was misled by the comment when the prosecutor's argument is viewed as a whole. (*People v. Avila* (2009) 46 Cal.4th 680, 714.) The jury was properly instructed as to what "particularly vulnerable" meant and there was substantial evidence supporting this aggravating factor. There was no reversible error here.

### 3. *Appeal to Passion*

Mendez-Torres contends that the prosecutor committed misconduct by appealing to the passions of the jury during his discussion of D.G.'s injuries at closing. He argues that this was prejudicial error and requires the reversal of his conviction on count five (fleeing police and causing serious bodily injury) and the GBI aggravating factor. We disagree.

### i. Relevant Procedural History

At trial (nine months after the collision), D.G. testified about his injuries and the impact the accident had on his daily life. When Mendez-Torres crashed into the front of his truck, D.G. testified, "My brain—I was hit so hard, it sounds weird, but I was hit so hard I could taste it." He had a cut on his head and was dazed for several seconds before someone tried to open the door of his truck. After the accident, he testified that he experienced neck and arm pain, headaches, nausea, as well as pain when lying down. The pain was at its worst three days after the accident. D.G. testified that although his pain had diminished since then, he still remained limited in his ability to paint, play with his dog, and drive.

During cross-examination, Mendez-Torres's counsel questioned D.G. about inconsistencies between his testimony and the symptoms he had previously reported to his doctor. For example, counsel asked if D.G. recalled telling his doctor several months after the accident that he did not

experience any pain during his daily activities or that he was "currently in about a 2 out of 10 of pain." D.G. responded he did not recall. He also did not recall telling his doctor that he was able to paint for a few hours. D.G. testified that he had memory loss and could not "remember things from the past."

During closing, Mendez-Torres's counsel argued that D.G.'s injury did not "rise to the level of great bodily injury or serious bodily injury." He attacked D.G.'s credibility by pointing to the discrepancies between his testimony and his prior medical reports. For example, counsel argued that "what he's saying is worse than before" and "the doctor . . . said he was able to paint[] for 5 hours . . . . Now [D.G.] says that's not the case." Counsel continued, "[t]hat's not the kind of thing a doctor just sort of puts in your medical records out of the blue."

During rebuttal, the prosecutor argued, "The fact that . . . months later he's saying a different number or he's not completely consistent, common sense when you look at what he said and his experiences over the last eight months, the trauma he's experienced. . . ." The prosecutor continued, "*I don't think anyone would want this to happen to anyone they love to experience what [D.G.] experienced.* This is a significant impact on his life, his ability to take care of himself, to provide for himself. But with common sense, you look at his statements, this information through the doctors with common sense. It's a lot simpler to not call him a liar and just saying maybe pain was different on different days." (Italics added.) Mendez-Torres's counsel did not object.

ii. Law and Application

We agree with the People that Mendez-Torres forfeited this claim by failing to object at trial. (*Seumanu, supra*, 61 Cal.4th at p. 1328 ["It is well

30

settled that making a timely and specific objection at trial, and requesting the jury be admonished . . . , is a necessary prerequisite to preserve a claim of prosecutorial misconduct for appeal"].)  But even if we reach the merits, we would find no prejudice.

"It has long been settled that appeals to the sympathy or passions of the jury are inappropriate at the guilt phase of a criminal trial." (*People v. Fields* (1983) 35 Cal.3d 329, 362.)  "[I]t is misconduct to appeal to the jury to view the crime through the eyes of the victim." (*People v. Mendoza* (2007) 42 Cal.4th 686, 704.)  Our high court has also found misconduct when the prosecutor asked the jury to imagine if the crimes " 'happened to one of your children.' " (*Pensinger, supra*, 52 Cal.3d at p. 1250.)

Here, the prosecutor's comment that the jury would not want what happened to D.G. to happen to a loved one did appear to be an improper appeal to the jury's sympathy or passions.  However, we find no reasonable probability that Mendez-Torres would have obtained a more favorable result absent this misconduct.[12] (*Riggs, supra*, 44 Cal.4th at p. 298.)  The prosecutor's comment "was an isolated one and . . . was not repeated." (*Pensinger, supra*, 52 Cal.3d at p. 1250.)  He quickly moved on after the comment, arguing that D.G. should be found credible despite the inconsistencies in his testimony because his pain may be "different on different days" and because there may be gaps in his memory about events that occurred several months ago.  D.G. also testified, without contradiction, that it was painful for him to turn his neck in any direction or to lie down and that his arm pain was "extreme," during the first several days after the accident.  It is not reasonably probable that the jury would have rejected

---

[12] We again decline to find that any prosecutorial misconduct "infected the trial with such unfairness" so as to deprive Mendez-Torres of due process.

D.G.'s testimony absent the stray comment by the prosecutor.

Mendez-Torres counters that the inconsistencies in D.G.'s testimony and the jury's initial deadlock establish that the GBI issue was a close one. Though this may be so, it does not mean that the prosecutor's isolated comment resulted in prejudice. Indeed, the trial court instructed the jury that the statements of counsel are not evidence.

**D. Evidentiary Issues**

Mendez-Torres challenges the admission of evidence of his past criminality. Although we agree that the admission of this evidence was erroneous and that defense counsel should have objected or sought redactions, we find no prejudice.

1. *Standard*

Relevant evidence is inadmissible if "its probative value is substantially outweighed by the probability that its admission will . . . create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.) "Evidence is prejudicial within the meaning of Evidence Code section 352 if it ' "uniquely tends to evoke an emotional bias against a party as an individual' " [citation] or if it would cause the jury to ' " 'prejudg[e]' a person or cause on the basis of extraneous factors." ' " (*People v. Cowan* (2010) 50 Cal.4th 401, 475.) "Due to these inherent risks, 'uncharged offenses are admissible only if they have *substantial* probative value.' " (*People v. Foster* (2010) 50 Cal.4th 1301, 1331.) Evidentiary challenges are reviewed for abuse of discretion. (*People v. Doolin* (2009) 45 Cal.4th 390, 437.)

2. *Admission of Monterey Jail Envelope*

Before trial, the prosecutor moved to admit an envelope addressed to Mendez-Torres at the Monterey County jail to prove that he drove the Buick.

Defense counsel responded, "I think the fact it shows he's in the county jail isn't relevant, but I think his name on the letter is relevant." The trial court found the envelope admissible and admitted the unredacted envelope into evidence during Detective Zachary Geddes's testimony without objection. Mendez-Torres contends that the court should have redacted the jail's name and address. We agree but find the error harmless.

Initially, the People contend that Mendez-Torres forfeited this contention because he did not expressly ask the trial court, either before or during trial, to redact any information on the envelope. Although his defense counsel's objection could have been much clearer, we broadly construe it to cover the contention. (See *People v. Abel* (2012) 53 Cal.4th 891, 924 [" 'What is important is that the objection fairly inform the trial court, as well as the party offering the evidence, of the specific reason or reasons the objecting party believes the evidence should be excluded, so the party offering the evidence can respond appropriately and the court can make a fully informed ruling' "].)

Turning to the merits, we agree that the Monterey County jail address had little or no probative value and was unduly prejudicial under Evidence Code section 352. The People argue that the jail's information "helped establish [the envelope's] authenticity" but do not explain why the jury would have otherwise doubted its authenticity when it was undisputed that the envelope was addressed to Mendez-Torres. There was also other evidence of Mendez-Torres's connection to the Buick, including a handwritten bill of sale that identified Mendez-Torres as the buyer. And the Buick's connection to the robbery was corroborated by the baseball cap and tan pants found in the Buick, which matched the clothing worn by the robber at the gas station.

Although the jail's information should have been redacted from the envelope, its admission was harmless because it was not reasonably probable that Mendez-Torres would have achieved a more favorable result absent the error.[13] (*People v. McDaniel* (2019) 38 Cal.App.5th 986, 1005 ["Evidentiary errors under state evidence rules are evaluated under the 'reasonable probabilit[y]' standard of prejudice announced in" *Watson, supra,* 46 Cal.2d 818].)

First, Mendez-Torres was being tried for multiple felonies he committed in two separate incidents occurring within 24 hours of each other. The jury was also aware of his prior strike offense. Under these circumstances, we do not see how evidence that Mendez-Torres may have recently been in jail made a difference here.

Second, the relevant evidence—which was largely undisputed— overwhelmingly established that Mendez-Torres drove under the influence while fleeing from the police and causing injury. (*People v. Lepere* (2023) 91 Cal.App.5th 727, 739 [errors were not prejudicial where there was "overwhelming evidence of [the defendant's] guilt"].) Mendez-Torres asserts that the DUI evidence was "conflicting and hotly contested" but cites nothing to support this assertion. Indeed, the evidence that he drove under the influence was both considerable and uncontroverted. A methamphetamine pipe was found in the car Mendez-Torres was driving and a bag of methamphetamine was found near the car. Mendez-Torres spontaneously admitted to the police that he had taken methamphetamine upon his arrest, and his blood draw revealed a methamphetamine concentration more than

---

[13] We do not consider whether the error affected Mendez-Torres's robbery conviction because we reverse that conviction due to instructional error. We also find that the error did not deprive Mendez-Torres of due process and trigger the *Chapman* standard of prejudice.

three times the level used for therapeutic purposes. A drug recognition expert who evaluated Mendez-Torres shortly after his arrest concluded that he was under the influence. In addition to an elevated pulse, which admittedly could have been caused by exercise or stress, the expert found white film and large heat bumps on the back of Mendez-Torres's tongue, which is indicative of recent methamphetamine use. The expert also observed that his left middle finger was "calloused and burnt and had . . . soot on it," which is evidence of smoking from a methamphetamine pipe. In light of this evidence, it is not reasonably probable that the jury would have reached a different conclusion on counts four (DUI causing injury) and five (fleeing a police officer and causing serious bodily injury) without the envelope.

Finally, we find no reasonable probability that the admission of the unredacted envelope affected the jury's findings on the aggravating factors. Mendez-Torres specifically identifies one aggravating factor—that D.G. suffered GBI—that he claims was affected by the erroneous admission of the envelope. But the jury's finding on that factor depended exclusively on D.G.'s testimony, and we do not see how evidence of Mendez-Torres's prior jail stint had any bearing on D.G.'s credibility.[14] We reach the same conclusion as to the other remaining aggravating factors. Indeed, Mendez-Torres never explains how the envelope affected any of the jury findings on the aggravating factors. We therefore find harmless the admission of the

_____

[14] That the jury was initially unable to reach a unanimous decision as to this aggravating factor does not compel a contrary conclusion. There is nothing to suggest that evidence Mendez-Torres may have spent time in jail in the past had anything to do with the jury's initial disagreements over this factor. Indeed, the jury quickly reached a unanimous decision that same day after the trial court provided it a further instruction on deliberations.

unredacted envelope.

### 3. *Admission of Other Evidence of Mendez-Torres's Criminality*

Mendez-Torres argues that his counsel was ineffective for failing to object to the admission of other evidence of his criminal propensity. Specifically, he contends that the following evidence should not have been admitted: (1) his misdemeanor citation issued by the Gilroy Police Department; (2) his prisoner property receipt; and (3) his statement following his arrest that he had been in jail 10 days ago for being drunk. Although we agree that his counsel should have objected, we find that no prejudice resulted.

#### i. Relevant Procedural History

Mendez-Torres's Gilroy citation was admitted into evidence without objection during Detective Geddes's direct examination. Geddes testified that the citation was found in the Buick and had Mendez-Torres's name on it. The prosecutor asked Geddes under what context he would issue a citation like this one. Geddes replied, "This would occur when somebody is guilty of a traffic infraction or a misdemeanor crime." The citation had the "misdemeanor" box checked and the word "[d]runk" written under the violation description. The prosecutor then asked Geddes how far Gilroy was from Sonoma; defense counsel objected but the trial court overruled the objection. Geddes responded, "[a]pproximately two hours." Later, the prosecutor asked Geddes whether Gilroy was in Monterey County. He responded that it was not.

The prosecutor next introduced the prisoner property receipt. Geddes confirmed that Mendez-Torres's name was on it, and the trial court admitted the receipt into evidence without objection. The receipt did not identify its source, such as the jail or county. When asked about the purpose of the

36

receipt, Geddes testified that it was "to keep track of a prisoner's items that [are] received by the jail when they are booked. And when they are released from jail, they're given the same items back and they're marked . . . on a receipt form so there's tracking and no lost property." The prosecutor then asked Geddes, "Let's say someone is put in jail and they are released with this receipt. Are they then given the receipt as proof of what they received?" Geddes responded, "Yes."

Later, the prosecutor introduced a transcript of Officer Figueroa's interview with Mendez-Torres after he was taken to the hospital following his arrest. The trial court admitted this transcript into evidence without objection. The transcript included a statement by Mendez-Torres that he was in jail 10 days ago in Gilroy for being drunk.

### ii.    Law and Application

The elements of an ineffective assistance of counsel claim are well established. "First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense." (*Strickland, supra*, 466 U.S. at p. 687.) Prejudice requires "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Id.* at p. 694.) A defendant has the burden of proving both requirements by a preponderance of the evidence. (*People v. Stratton* (1988) 205 Cal.App.3d 87, 93.)

Here, Mendez-Torres's counsel's performance was deficient because there was no tactical reason for his failure to object to evidence of Mendez-

37

Torres's prior criminality. (*People v. Roberts* (2011) 195 Cal.App.4th 1106, 1130-1131.) Contrary to the People's contention, the citation and receipt were not necessary to establish Mendez-Torres's connection to the Buick because the Monterey County jail envelope with his name on it was also admitted. In addition, other items found in the Buick, such as the handwritten bill of sale identifying Mendez-Torres as the buyer of the car and clothes similar to the clothes worn by the robber, connected Mendez-Torres to the car and robbery. There was also no tactical reason for his counsel's failure to object to the prosecutor's question asking Geddes whether Gilroy was in Monterey County. The only conceivable purpose of this question was to highlight that Mendez-Torres likely committed at least *two* different criminal offenses requiring a stay in jail in two different counties. Nor was Mendez-Torres's statement that he had recently been in jail relevant to his identity as the perpetrator of the charged crimes or his motive for fleeing the police. The prosecutor consistently argued that Mendez-Torres fled because he had just robbed a gas station the day before and had a large amount of cash in his pockets.

We also disagree with the People that these three pieces of evidence of Mendez-Torres's prior criminality were not unduly prejudicial (Evid. Code, § 352) because they "appeared to relate to a single incident" of public drunkenness. The date on the citation is unclear and the receipt does not specify a date or county. As a result, the jury could have reasonably inferred that the two documents stemmed from separate arrests or incidents. This prejudice was compounded by the admission of the unredacted Monterey County jail envelope and Geddes's testimony that the Gilroy citation was unrelated to any jail time Mendez-Torres might have spent in Monterey County.

Despite his counsel's deficient performance, it is not reasonably probable that Mendez-Torres would have achieved a more favorable outcome absent the admission of this evidence. As explained above, evidence that Mendez-Torres may have spent time in jail or recently committed some other misdemeanors was highly unlikely to have influenced the jury's findings on the charged crimes or the aggravating factors in light of the relevant evidence at trial. (See, *ante*, at pp. 30-32.) Moreover, the prosecutor never mentioned Mendez-Torres's prior criminality during his closing. In referencing the documents from the Buick, the prosecutor only told the jury that the Buick "had multiple pieces of mail or items . . . with [Mendez-Torres's] name on it." We therefore find no prejudice.

### E. Cumulative Error

Because we find no error with respect to any of the aggravating factors found true except for one, we do not discuss Mendez-Torres's final argument regarding cumulative error.

## DISPOSITION

The judgment is reversed with respect to Mendez-Torres's conviction for robbery. On remand, the People may elect to retry him for robbery. The matter is further reversed and remanded for resentencing as to counts four and five. The trial court is instructed to resentence Mendez-Torres on these counts without consideration of the aggravating factor that the damage to the victim's truck was of great monetary value. In all other respects the judgment is affirmed.

CHOU, J.

WE CONCUR:

SIMONS, ACTING P. J.
BURNS, J.

*People v. Jose Angel Mendez-Torres* (A168697)

## A168697/The People v. Jose Angel Mendez-Torres

Trial Court:      Superior Court of the County of Sonoma, No. SCR7562641.

Trial Judge:      Hon. Mark A. Urioste.

Counsel:      Kelly C. Martin, under appointment by the Court of Appeal, for Defendant and Appellant.

                Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Jeffrey M. Laurence, Senior Assistant Attorney General, Bridget Billeter, Supervising Deputy Attorney General, Moona Nandi and Brady A. Baldwin, Deputy Attorneys General, for Plaintiff and Respondent.